UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

Billy G. Schindewolf, et al )
)
    Plaintiff(s), )
)
v. ) Case No. 5:10-CV-145-RS-MD
)
Seymour Construction, Inc. et al )
)
    Defendant(s) )
_____ )

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AS AMENDED

### I. FINDINGS OF FACT

1. Although Billy G. and Dora Schindewolf are listed as Plaintiffs, together with their Schindewolf Living Trust, it would appear that the proper Plaintiff is the Schindewolf Living Trust, (hereinafter "the Trust"). However, although the Schindewolfs did not appear as Trustees of that Trust, it further appears that they may properly testify on behalf of the Trust.

2. The Trust was created with funds received from an inheritance by the Schindewolfs and the Trust purchased real estate in Panama City Beach, Florida, known as "The View" or as the "Project". The Schindewolfs purchased "The View" lands from friends of their Grandson, Nathan Schindewolf for 7 Million Dollars. The evidence at Trial indicated that the Schindewolfs Grandsons friends had acquired "The View" property for the sum of 5 Million Dollars.

3. The evidence is clear that, through their attorney, Kevin Keough, Plaintiffs approached Seymour Construction, Inc. in connection with the possible development of "The View." Kevin Keough was aware of the work that Seymour Construction, Inc. was doing in the Atlanta, Georgia area and was impressed enough with same to induce Seymour Construction, Inc., through

its President, Scott Seymour, to visit with the Schindewolfs to discuss the possibilities of Seymour Construction, Inc.'s development of "The View". During that visit Seymour Construction, Inc., provided the Schindewolfs and the Trust with the necessary funding requirements by Seymour Construction, Inc. After submittal of Seymour Construction, Inc.'s funding requirements, the Schindewolfs and their Grandson traveled to Atlanta, Georgia to view some of the projects Seymour Construction, Inc., was involved in.

4. A Memorandum of Interest dated May 7, 2007, was submitted by Kevin Keough to Seymour Construction, Inc., which set forth the proposed development of the project and Seymour Construction, Inc.'s indicated capabilities. The Memorandum was non-binding and signed by Seymour Construction, Inc. but not signed by Billy or Dora Schindewolf. A Memorandum of Interest dated June 6, 2007, was submitted to Seymour Construction, Inc. By Kevin Keough on behalf of the Schindewolfs which referred to the monies to be advanced to Seymour Construction, Inc., and again, was a non-binding Memorandum intended to frame the foundation and the basic business points of a future partnership, further providing that no contract would arise between the parties until such time as they had negotiated to their mutual satisfaction all other essential terms and have executed a definitive legal agreement setting forth the same. Both Memorandums provided for the Schindewolfs, as owners, to receive the initial $500,000.00 as a preferred distribution from the limited liability company to be established, as repayment of their $500,000.00 for soft costs and expense to Seymour Construction. The agreement was signed by Scott Seymour as President of Seymour Construction, Inc., and by Billy Schindewolf and Dora Schindewolf, individually.

5. The evidence at trial indicated that soft costs and expenses were properly utilized to pay salaries of Seymour Construction employees working on various aspects of "The View" project and testimony of Kevin Keough was to the effect that such payments were "atypical". However, no evidence was indicated at trial or indicating the time expended by the three Seymour Construction, Inc. employees.

6. During the negotiations between the Schindewolfs and Seymour Construction, Inc. referenced above, it was represented that a payment of $500,000.00 for "soft costs" and expenses

2

would be required to be paid in advance of the initiation of the project development. The evidence at trial indicated that "soft costs" and expenses of $50,000.00 were incurred for the retention of an architectural firm regarding "The View" construction process and testimonies at trial included that a local attorney has been retained for the purposes of monitoring and advising Seymour Construction, Inc. and its employees concerning zoning requirements and changes to those requirements during the planning of "The View" project, as well as for payment of salaries of three individuals retained by Seymour Construction, all of whom worked on various stages of the project during the period July through December 2007.

7. Evidence at trial further indicated that prior to or during the initial stages of the pending litigation, the Schindewolfs wrote their attorney, Kevin Keough and his firm, demanding to be paid damages allegedly due to negligence on the part of Kevin Keough and his firm for the mishandling of their affairs. This Court did review correspondence regarding a settlement of that dispute in camera.

## II. CONCLUSIONS OF LAW

### FRAUD

#### Facts Pertinent to the Fraud Claim Alleged in the Complaint

8. Plaintiffs allege that they agreed to a contract, the "MOI" (Memorandum of Interest), with Seymour Construction (hereinafter Seymour). But note that the MOI states that:

> "This Memorandum is non-binding and is intended to frame the foundation and the basic business point of a future partnership. No contract shall arise until such time as the parties have negotiated to their mutual satisfaction all other essential terms, and have executed a definitive legal agreement setting forth the same."

9. The MOI in question provided Plaintiffs would "advance" Defendants $500,000.00 and that the money would be refunded "in the event that the project had not made substantial progress by June 1, 2008". Complaint, ¶10.

10. Plaintiffs sued for breach of the terms of the MOI and alleged:

  (1) Defendants "failed to do the work entitling them to keep all or any part of the funds received . . ." Complaint, ¶ 16

  (2) "Pursuant to the MOI . . . Defendants must refund to Plaintiffs the full sum of $500,000, plus interest . . ." Complaint, ¶ 17

11. Seymour, individually, and as representative of Seymour Construction, Inc. "solicited funds from Plaintiff for the sole purpose of converting those funds to his own use on other projects." Complaint, ¶34

12. Seymour intended to use Plaintiffs' money for other projects. Complaint, ¶35

13. Fraud was deliberate. Complaint, ¶37

14. Although Plaintiffs attempt to designate their Cause of Action as fraud in the inducement, they are actually alleging "fraud in the performance". Because the factual allegations of the Complaint do not allege fraud in the inducement, but rather a failure of Seymour Construction to perform either an express or implied contract which is, of note, a non-binding contract, Plaintiff's claim is precluded by the economic loss rule and does not state a cause of action.

15. Plaintiffs cite *Mergens v. Dreyfoos*, 166 F.3d 1114 (11th Cir. 1999) which is a fraud in the inducement case.

16. In *Mergens*, the plaintiffs alleged that:

  their fraud causes of action survive the release because Dreyfoos fraudulently misrepresented in the Agreement that he had no current intention to sell PEC or any of its assets. To prove fraud under Florida law, the plaintiff must show that "1)the defendant made a false representation of past or present fact, 2)the

4

defendant knew the statement was false, 3)the statement was made for the purpose of inducing the plaintiff to rely on it, and 4)the plaintiff's reliance was reasonable." *Finn v. Prudential-Bache Securities, Inc.*, 821 F.2d 581, 586 (11th Cir.1987)(citing *Pettinelli v. Danzig*, 722 F.2d 706, 709 (11th Cir.1984)).

*Id.* at 1117.

However, the Court dismissed that argument, holding:

> The Mergenses contend, notwithstanding Pettinelli and its progeny, that they were justified in relying on representations set forth in the written agreement, no matter how adversarial the relationship might be. This argument is plainly correct, but only to the extent that they have a right to rely on an express term when pursuing a contract cause of action. As the court explained in Pettinelli, where a written agreement explicitly contains representations, and those representations have not been performed, a breach of contract action may be appropriate. 722 F.2d at 710. As the Mergenses have not plead breach of contract, no cause of action is available based on such a theory. FN2
>
> 2 We offer no opinion as to the merits of such a claim. We only note that when express terms in a contract are breached the appropriate action is for breach of contract.

*Id.* at 1118.

Therefore, under *Mergens*, as cited by the Plaintiffs, Plaintiffs cannot sue for fraud in the inducement when the MOI clearly requires Seymour Construction, Inc. to perform the actions that the Plaintiffs allege Seymour fraudulently promised to perform to get the $500,000, because that allegedly fraudulent promise was expressed in the MOI. They can only sue for breach of the agreement by failing to perform.

5

17. What the Plaintiffs complain of here is that Seymour Construction, Inc. failed to keep its promise to work on the real estate development project. Plaintiffs Complaint, in fact, is for the failure of Seymour Construction, Inc. to perform, not in the inducement. Indeed, Plaintiff's counsel, Kevin Keough, approached Seymour Construction, Inc. regarding the project and arranged for Scott Seymour, on behalf of Seymour Construction, Inc., to travel to the Schindewolf's residence. Therefore, the cause of action is barred by the economic loss rule. The test for distinguishing fraud in the inducement from fraud in the performance is:

> To determine whether the economic loss rule bars recovery under fraud, the question is simply this: is the fraud alleged in an act of performance or in a term of the bargain? Where, as here, the representation is simply made and relied upon in inducing the completion of the transaction, then clearly it is a term of the bargain. . . . If, however, the misrepresentation had been in connection with the seller's performance . . . which required continuing action . . ., then the fraud is in the performance and the economic loss rule bars recovery sounding in tort.

*Allen v. The Stephan Co.*, 784 So.2d 456, 458 (Fla. 4th DCA 2000)

18. The Plaintiffs claim that Seymour committed its fraud by promising to perform under the terms of the MOI when it had no intention of performing. Here, the MOI expressly obligates Seymour to render certain services to the Plaintiffs in exchange for the $500,000. Seymour was to perform those services subsequent to the execution of the MOI. Even assuming Plaintiffs' allegations to be true, the economic loss rule precludes a cause of action for fraud in the inducement, because the Plaintiff's claim arises from Seymour's failure to perform the promises expressed in the MOI.

19. In general, a fraud in the inducement claim is not barred by the Economic Loss Rule if the plaintiff can demonstrate that it is a tort independent from the breach of contract. *See HTP, Ltd.*

6

*v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238 (Fla. 1996). However, where the alleged fraudulent misrepresentations are inseparably embodied in the parties' subsequent agreement, the Economic Loss Rule will apply.

> *Bates v. Rosique*, 777 So.2d 980, 982 (Fla. 3d DCA 2001).
> Applying common sense to the Supreme Court's analysis [in *Htp, Ltd.*], we decline to adopt the defendants' position that one can always avoid operation of the economic loss doctrine by merely pleading fraud in the inducement. A critical distinction must be made where the alleged misrepresentations are inseparably embodied in the parties' subsequent agreement.

> *Id.* The *Bates* court went on the distinguish the allowance of a cause of action for fraud in the inducement in *Allen v. The Stephan Co.*, 784 So.2d 456, 458 (Fla. 4th DCA 2000), on the grounds that in *Allen* the fraudulent representations embodied in the written agreement did not require later performance under the terms of the agreement, stating:
> We find *Allen* to be inapposite to the instant matter. This was not a case where Buyers were simply informed that certain development documents were in existence prior to entering into the contract for purchase and sale. Instead, Buyers entered into said agreement with the understanding that, not only did these documents exist, but that Sellers would turn over these valuable, material documents to Buyers upon closing. These representations were later made a part of the contract itself. Thus, unlike the circumstances in *Allen*, the alleged misrepresentations by Sellers in this case were made in connection with Seller's performance under the purchase and sale agreement.

*Id.* at 982-3.
*See also, D&M Jupiter, Inc. v. Friedopfer*, 853 So.2d 485, 488 (Fla. 4th DCA 2003)

By contrast, the economic loss rule was held to bar recovery in *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74 (Fla. 3d DCA 1997) and *Straub Capital Corp. v. L. Frank Chopin, P.A.*, 724 So. 2d 577 (Fla. 4th DCA 1998). In *Hotels of Key Largo*, the parties negotiated for continuing action on the part of the seller to provide increased reservation systems and better hotel management services. When the seller failed to deliver the benefits negotiated for, the buyer brought suit. The economic loss rule applied in *Hotels of Key Largo* and barred any tort recovery because the fraud was clearly in the performance of the bargain since the injury was one which flowed from the failure to perform the heart of the agreement. In *Straub Capital Corp.*, the dispute was centered around the fraudulent failure of a landlord to timely build out and provide the contracted-for space to his tenants. Again, there was a failure to perform the heart of the agreement.

> *Compare, Meterlogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp 2d 1346, at 1362 (S.D. Fla. 2000)

20. The fact that Plaintiffs allege that Seymour fraudulently promised to perform under the MOI does not save a cause of action for fraud in the inducement. As stated in *Topp, Inc. v. Uniden Am. Corp.*, 513 F. Supp. 2d 1345, 1348-9 (S.D. Fla. 2007)(Citing *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 208 F. Supp. 2d 1310, 1319 (S.D. Fla. 2002)

> Misrepresentations relating to the breaching party's performance under a contract do not give rise to [*1349] an independent cause of action because such misrepresentations are interwoven and indistinct from the heart of the contractual agreement. *Hotels of Key Largo*, 694 So. 2d at 78; *see also Premix-Marbletite Mfg. Corp. v. SKW Chems., Inc.*, 145 F. Supp. 2d 1348 (S.D. Fla 2001) (barring fraudulent inducement claim where misrepresentations constituting fraud went "directly to the heart of the parties'

contractual relationship"). **Ultimately, a claim that a defendant fraudulently induced a party to enter a contract by misrepresenting his intention to abide by the terms of the contract is barred by the economic loss rule.** *Excess Risk*, 208 F. Supp. 2d at 1319.

(Emphasis added).

*See also Taylor v. Maness*, 941 So.2d 559, 564 (Fla. 3d DCA 2006)

> The Taylors are correct that a fraud in the inducement claim is not barred by the economic loss rule so long as the claim is based on conduct that is separate and distinct from the conduct constituting the breach of contract. *La Pesca Grande Charters, Inc. v. Moran*, 704 So. 2d 710, 713 (Fla. 5th DCA 1998); see also *Indem. Ins. Co. v. Am. Aviation Inc.*, 891 So. 2d 532, 537 (Fla. 2004)("Fraudulent inducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract.").
>
> The Taylors, however, state that "[t]he term of the bargain that was false - Maness owns the property and can sell it - is the basis for the fraud in the inducement. This is the term of the bargain that led [them] to enter into the agreement and forego purchasing a different property." . . . The second part of the statement, that Mr. Maness can sell the property, is clearly embodied in the terms of the contract as "Mr. Maness' ability to sell" is not conduct that is separate and distinct from the conduct constituting the breach of contract. It is this particular conduct, Mr. Maness' inability to sell the Marathon Property, which forms the basis of the Taylors' breach of contract claim. Simply labeling a "fraud in the performance" claim as "fraud in the inducement" is not sufficient to avoid the economic loss rule. Similarly, the Taylors cannot escape the economic loss rule in their negligent

9

misrepresentation claim as the alleged negligent misrepresentation relates to the performance of the contract. Consequently, as the Taylors are seeking to recover damages in tort for a matter which arises from a breach of contract claim, the trial court properly concluded that the economic loss rule barred recovery for the fraud in the inducement and negligent misrepresentation claims.

## **CONVERSION**

21. With regard to the claim for the tort of conversion of the $500,000 by Seymour, the same reasoning applies as before under the economic loss rule. Specifically, under Florida Law, a cause of action for conversion does not lie when the money which the plaintiff seeks to recover was consideration for an express or implied agreement.

22. As stated in *Gasparini v. Pordomingo*, 972 So.2d 1053, 1055 (Fla. 3d DCA 2008):

> We also agree with the appellants that International Trading cannot be held liable for conversion or civil theft. It is well-established law in Florida that a simple debt which can be discharged by the payment of money cannot generally form the basis of a claim for conversion or civil theft. [citations omitted]

23. The same result was reached in the case of *Spanish Broad. Sys. of Fla., Inc. v. Alfonso*, 689 So.2d 1092, 1094 (Fla. 3d DCA 1997), in which it was stated:

> Finally, we also agree with SBS that Alfonso's purported conversion count was actionable only in contract, therefore, SBS was entitled to a directed verdict on this tort action as well. Specifically, the evidence in support of this count indicated that Alfonso had an ongoing practice of purchasing music for

10

his radio show and charging such purchases on his personal credit card. The station would then reimburse him for his expenses. Clearly, Alfonso's entitlement to reimbursement for the purchase of recordings was based upon a mutual agreement or understanding between him and the station. We therefore conclude that his claim for the station's nonreimbursement of certain such purchases was properly cognizable under contract law rather than tort.

## **PERSONAL LIABILITY–PIERCING THE CORPORATE VEIL**

24. Because Seymour cannot be found liable for fraud or conversion and does not operate the corporation as an alter ego, Seymour cannot be held individually liable for corporate obligations. No evidence exists which indicates that Scott Seymour established Seymour Construction, Inc., for the express purpose of working on "The View" project. Neither does evidence exist, indicating that Scott Seymour is the alter ego of Seymour Construction

25. As stated in *Gasparini v. Niguel Villar Prdomingo and Vitala, S.A.*, 972 So.2d 1053, 1055 (Fla. 3d DCA 2008)

> A general principle of corporate law is that a corporation is a separate legal entity, distinct from the persons comprising them. *Am. States Ins. Co. v. Kelley, 446 So. 2d 1085, 1086 (Fla. 4th DCA 1984)*. To "pierce the corporate veil" three factors must be proven:
>
>> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation;

11

(2) the corporate form must have been used fraudulently or for an improper purpose; and

(3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998) (quoting *In re Hillborough Holdings Corp.*, 166 B.R. 461, 468 (Bankr. M.D. Fla. 1994)).

Furthermore:

"[E]ven if a corporation is merely an alter ego of its dominant shareholder or shareholders, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained."

*Id.* (Quoting *Lipsig v. Ramlawi*, 760 So. 2d 170, 187 (Fla. 3d DCA 2000).

26. The Plaintiffs must prove wrongdoing by those who control the corporation such that the corporation was used as a mere instrumentality to avoid personal liability. The Florida Supreme Court in *Dania Jai-Alai Palace, Inc. v. Carrousel Concessions, Inc.*, 450 So.2d 1114, 1119-20 (Fla. 1984), quoted *Riley v. Fatt*, 47 So.2d 769 (Fla. 1950) for the proposition that:

The rule is that the corporate veil will not be pierced, either at law or in equity, unless it be shown that the corporation was organized or used to mislead creditors or to perpetrate a fraud upon them. . . . In the absence of pleading and proof that the corporation was organized for an illegal purpose or that its members fraudulently used the corporation as a means of evading

12

liability with respect to a transaction that was, in truth, personal and not corporate, Fatt cannot be heard to question the corporate existence but must confide his efforts to the remedies provided by law for satisfying his judgment *from the assets of the corporation*, if any can be found. (Citations omitted, emphasis in original.)

*Id.* at 773.

The Supreme Court in *Dania* went on to explain:

In *Roberts' Fish Farm v. Spencer*, 153 So.2d 718 (Fla. 1963), we held that the Florida Industrial Commission did not have jurisdiction to pierce the corporate veil. Although Roberts' Fish Farm presented different factual and legal issues than those presented here, our remarks on the purpose of corporate entities and the rationale for the law controlling the piercing of the corporate veil are apropos:

The corporate entity is an accepted, well used and highly regarded form of organization in the economic life of our state and nation. As we said in *State ex rel. Continental Distilling Sales Co. v. Vocelle*, 1946, 158 Fla. 100, 27 So.2d 728, "Their purpose is generally to limit liability and serve a business convenience." Those who utilize the laws of this state in order to do business in the corporate form have every right to rely on the rules of law which protect them against personal liability unless it be shown that the corporation is formed or used for some illegal, fraudulent or other unjust purpose which justifies piercing of the corporate veil. This is the reason for the rule, stated in all Florida cases, that the HN7Go to the description of this courts are reluctant to pierce the corporate veil and will do so only in a court of

13

competent jurisdiction, after notice to and full opportunity to be heard by all parties, and upon showing of cause which necessitates the corporate entity being disregarded in order to prevent some injustice.

*Id.* at 721.

The *Dania* Court concluded: "that the district court decision directly and expressly conflicts with decisions of this Court which hold that the corporate veil may not be pierced absent a showing of improper conduct." *Id.* at 1121

See also: *N. Am. Clearing, Inc. v. Brokerage Computer Sys., Inc.*, 666 F. Supp. 2d 1299, 1306 (M.D. Fla. 2009); *rev. in part, other grounds, unpublished opinion*, 395 Fed. Appx. 563; 2010 U.S. App. LEXIS 18427 (11th Cir. September 2, 2010), construing Florida Law, in which the District Court held:

> Piercing the corporate veil in Florida traditionally requires two elements: first, "the corporation is in actuality the alter ego of the stockholders," and second, "it was organized or after organization was employed by the stockholders for fraudulent or misleading purposes." *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1120 (Fla. 1984). As previously discussed by this Court (Case No. 07-1503, Doc. No. 141 at 8-9), the Florida Courts of Appeal tend to incorporate the elements of causation and damages into the standard for piercing the corporate veil. *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008); *Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998) (citing *Hillsborough Holdings*, 166 B.R. at 468-69); see also *U-Haul Intern., Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1043 (9th Cir. 1986) (reasoning that the alter ego theory under Sykes requires

14

fraudulent or misleading conduct to be directed at the plaintiff); *Solomon v. Betras Plastics, Inc.*, 550 So. 2d 1182, 1184-85 (Fla. 5th DCA 1989) (Cobb, J., dissenting) ("[T]he demonstrated improper conduct must be the proximate cause of the alleged loss."). Accordingly, BCS must prove that (1) Goble is the alter ego of NAC; and (2) NAC was organized or used by Goble for an improper purpose that caused injury to BCS. *In re Hillsborough Holdings Corp.*, 166 B.R. 461, 468-69.

27. Even if Goble is the alter ego of NAC, there still must be a showing of "improper conduct" by Goble that damaged BCS in order to pierce NAC's corporate veil. *Sykes*, 450 So. 2d at 1121; *In re Hillsborough Holdings Corp.*, 166 B.R. 461, 468-69. In defining improper conduct for purposes of piercing the corporate veil, the Eleventh Circuit quoted the Supreme Court of Florida, stating: "[i]mproper conduct is present only in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose."

**Personal Liability of Seymour**

28. There are no allegations of a contract with Seymour in his personal capacity. Accordingly, there must be a cause of action for piercing the corporate veil.

    a. To pierce the corporate veil the Supreme Court of Florida Stated:

> The corporate veil will not be penetrated either at law or in equity unless it is shown that the corporation was organized or employed to mislead creditors or to work a fraud upon them.
>
> Every corporation is organized as a business organization to create a legal entity that can do business in its own right and on its own credit as distinguished from the credit and assets of its individual stockholders. The mere fact that one or two individuals own and control the stock structure of a corporation does not lead inevitably to the conclusion that the

15

corporate entity is a fraud or that it is necessarily the alter ego of its stockholders to the extent that the debts of the corporation should be imposed upon them personally. If this were the rule, it would completely destroy the corporate entity as a method of doing business and it would ignore the historical justification for the corporate enterprise system.

*Dania Jai-Alai Palace, Inc. v. Carrousel Concessions, Inc.*, 450 So.2d 1114, 1120 (Fla. 1984)(Quoting: *Advertects, Inc. v. Sawyer Industries, Inc.*, 84 So.2d 21, 23-4 (Fla. 1955)

29. There is no pleading or evidence that Seymour took the money for his personal use, therefore no personal liability can exist.

30. Mr. and Mrs. Schindewolfs are suing personally. However, the Pretrial Stipulation of the parties indicates that the money came from the Living Trust. Accordingly, the living trust is the only proper plaintiff and the Schindewolfs cannot show they were personally damaged.

See *Merrill v. Trump*, 745 So.2d 559 (Fla. 5th DCA 1999) for a general discussion:

> The counterclaim filed after Trump's death against him in his individual capacity is similarly a nullity. Eagle. We cannot tell from this record whether a Florida court could obtain jurisdiction over Trump's estate on grounds other than those asserted in this lawsuit under § 737.306(2). That statute provides that claims for breach of fiduciary duty may be brought against a trustee in an accounting, surcharge, indemnification, or any other appropriate proceeding. At the time the counterclaim was filed, Trump was no longer a trustee due to his death, hence jurisdiction against his estate does not lie in this lawsuit on the basis of § 737.306(2).
>
> We cannot tell from this record whether a Florida court could acquire jurisdiction over Trump's estate through his personal representative for the purpose of bringing a breach of fiduciary duty suit, or whether such a suit must be brought in another jurisdiction. See § § 734.201; 734.202; 48.193. The successor trustee of the Trusts (when appointed) will also have the authority and right to pursue an action on behalf of the Trusts for breach of fiduciary duty against Trump's estate (through his personal representative) if jurisdiction is properly obtainable.

*Id.* at 561.

Based on the foregoing, the Court finds that no liability exists on the part of Defendant, Scott Seymour, individually, and that based on the Economic Loss Rule, no liability exists on the part of Defendant, Seymour Construction, Inc., and this case is dismissed, with prejudice and costs are to be awarded to defendants, to be paid by Plaintiffs upon further order of this Court.

Respectfully submitted this 28th day of April, 2011.

/s/ C. Edwin Rude, Jr.
**C. EDWIN RUDE, JR.**
Florida Bar Number: 0157985
211 East Call Street
Tallahassee, Florida 32301-7607
Telephone: (850) 222-2311
Facsimile: (850) 222-2120
Attorney for Defendants

### CERTIFICATE OF SERVICE

I CERTIFY that a true and correct copy of the foregoing has been furnished via electronic means and/or U.S. Mail to Clayton Winter Crevasse, Roetzel & Andress, 2320 First Street, Fort Myers, FL 33901 and Ronald S. Kopp, Esq., Roetzel & Andress, LPA, 222 S. Main Street, Suite 400, Akron, OH 44308; C. Edwin Rude, Jr., 211 E. Call Street, Tallahassee, FL 32301 and all other parties in interest as indicated on the Court's mailing matrix this 28th day of April, 2011.

/s/ C. Edwin Rude, Jr.
**C. EDWIN RUDE, JR.**