IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

BILLY SCHINDEWOLF,
DORIS SCHINDEWOLF,
and SCHINDEWOLF LIVING
TRUST, DATED AUGUST 8,
2001,

Plaintiffs,

vs.                                            CASE NO. 5:10cv145/RS-CJK

SEYMOUR CONSTRUCTION,
INC. and SCOTT SEYMOUR,

Defendants.
_____/

## JUDGMENT

Plaintiffs brought six claims against Defendants: (1) breach of contract, (2) unjust enrichment, (3) quasi contract, (4) conversion, (5) piercing the corporate veil against Scott Seymour, individually, and (6) fraud. Plaintiffs also seek punitive damages in count four and count six. A bench trial was held April 18-19, 2011.

## FINDINGS OF FACT

With proceeds from the sale of an inherited property, Plaintiffs Bill and Doris Schindewolf created the "Schindewolf Living Trust," which is also a party to

1

this action.[1]  In August of 2006, the Schindewolfs used some of the trust funds to purchase a piece of property and invest in a real estate project in Panama City Beach, Florida, named "The View."  The transaction consisted of both the purchase of a small triangular piece of property on Panama City Beach and participation in the development of a high rise condominium unit to be built on the property.

The project was "pitched" to the Schindewolfs by two friends of their grandson, Nathan Schindewolf.  However, the project did not evolve as quickly as the Schindewolfs had hoped, and ultimately the Schindewolfs lost all contact with Nathan's friends who were supposed to be leading the project.  As a result, the Schindewolfs' legal counsel, Kevin Keogh, began to assist the Schindewolfs in finding someone to further develop the project.  In 2007, Keogh or Jack Coppenger, a contact of Keogh, introduced the Schindewolfs to Scott Seymour, a developer in Atlanta.  Seymour traveled to the Ohio home of the Schindewolfs to discuss the project and his interest in taking on the development of it.  The Schindewolfs were impressed with Seymour and traveled to Atlanta to Seymour's office and also visited some of Seymour's other projects.

As attorney for the Schindewolfs, Keough oversaw the negotiations between the Schindewolfs and Seymour.  Seymour requested $500,000 from the

---

[1] At trial the complaint was amended to reflect the Schindewolfs appearing both individually and as trustees of the Schindewolf Living Trust.  *See* Doc. 73.

Schindewolfs for "soft costs" associated with the project. A memorandum of interest ("MOI") dated June 6, 2007, was signed by both the Schindewolfs and Scott Seymour as President of Seymour Construction. (Exhibit 57)[2]. The MOI states that the Schindewolfs "would be required to advance the sum of $500,000 for anticipated soft costs related to the Project." The MOI goes on to state:

> Both parties acknowledge Owner [the Schindewolfs] will be advancing Seymour [Construction] the sum of $500,000 with $250,000 payable upon execution of this document and the remaining $250,000 payable by June 30, 2007. Upon the request of the Owner the $500,000 (less any direct costs) will be refunded to Owner in the event the project has not made substantial progress by January 01, 2008.

The Schindewolfs complied with the terms of the MOI and ultimately provided Seymour Construction a total of $500,000 for these soft costs. However, substantial progress had not been made on the project by January 1, 2008. The Schindewolfs' attorney contacted Seymour Construction and requested the return of the $500,000 pursuant to the agreement. (Exhibit 60). Seymour Construction spent $50,000 of the $500,000 soft costs advanced to it to pay Bayne Collins, an architect. Seymour Construction did not spend any of the balance of the $500,000 on any soft costs, and yet failed to return these funds to the Schindewolfs.

Scott Seymour's testimony that "soft costs" included payment of Seymour Constructions employee salaries was simply not credible, particularly in light of

---

[2] Defendants argued that a different MOI (Exhibit 58) was controlling. However, this MOI was not signed by the Schindewolfs. Furthermore, the MOI in Exhibit 58 still states that the $500,000 sum was to be used for soft costs, and the evidence at trial showed that other than the $50,000 provided to architect Bayne Collins, none of the money was used for soft costs. Therefore, the distinctions between the two MOI's make little difference.

the numerous other witnesses who testified to the contrary.  Bayne Collins, a disinterested party with expertise in the construction field, testified that soft costs were costs of a project not related to the construction, such as expenses for architects, engineers, attorneys, accountants, and marketing.  He further testified that it was inappropriate in the industry for a developer to call his own internal operating expenses, including payroll, "soft costs."  Nathan Schindewolf, Doris Schindewolf, and Kevin Keough testified to a similar understanding of the definition of soft costs.  Seymour was completely alone in his testimony that soft costs included employee salaries.

   Seymour's testimony additionally lacked credibility because it was contradictory.  Seymour testified on direct examination in Plaintiffs' case in chief that all the employees at Seymour Construction worked exclusively on The View project for one full year, and therefore their paychecks for that year should be deducted from the "soft costs."  However, the following day of trial on cross examination by Plaintiffs' counsel, Seymour denied that all his employees were working on the project full time for a year, and stated that he did not know and could not estimate many hours each day each of his employees were working on The View project.[3]  In addition, Robin Kidd, a Seymour Construction bookkeeping employee, testified that there were other projects going on during the relevant time

---

[3] In closing argument defense counsel suggested that an appropriate estimate would be 25% of the employees' time. However, Seymour never testified to this fact and therefore it did not come into evidence.

period at Seymour construction and that she was unaware of any work going on with The View project. She also testified that she never spent any time working on the project in 2007. Despite not knowing how much time his employees spent on The View project, Seymour still maintained that $443,000, a years worth of employee salaries,[4] should be considered "soft costs" and therefore deducted from the $500,000 provided by the Schindewolfs. This testimony was simply not credible.

## CONCLUSIONS OF LAW

Plaintiffs brought six claims against Defendants. They are addressed in turn.

### Count 1: Breach of Contract

The elements of an action for breach of contract are: (1) the existence of a contract; (2) a breach of the contract; and (3) damages resulting from the breach. *Rollins, Inc. v. Butland,* 951 So.2d 860, 876 (Fla. 2d DCA 2006). Here, there is a written agreement signed by both parties, the June 6, 2007, MOI (Exhibit 57). The MOI provides that the Schindewolfs will be advancing $500,000 to Seymour Construction for soft costs. The evidence at trial made clear that the Schindewolfs did advance $500,000 to Seymour Construction, but only $50,000 of that money

---

[4] This figure comes from Seymour Construction's 2007 payroll records. The relevant time period is mid-2007 to mid-2008, but Defendant did not provide these records to Plaintiffs or the Court. However, the 2007 annual payroll amounts are a sufficient estimate of the payroll expenditures in the relevant time period from 2007 to 2008, which was also approximately one year.

was actually spent on soft costs. Therefore, Seymour Construction breached the contract.

Furthermore, the agreement specifically provides that "[u]pon the request of the Owner the $500,000 (less any direct costs) will be refunded to Owner in the event the project has not made substantial progress by January 01, 2008." (Exhibit 57). The Schindewolfs made such a request after the project had not progressed by January 1, 2008, and Seymour Construction did not refund the $500,000. Therefore, Seymour Construction also breached the contract in this regard. The Schindewolfs were damaged in the amount of $450,000, the amount that was not spent on soft costs and not returned to them by Seymour Construction. Plaintiffs should recover this amount.

## Count 2: Unjust Enrichment

Even if the June 6, 2007, MOI was not a valid contract between the parties, Plaintiffs would recover under the theory of unjust enrichment. The elements that must be proven to prevail on a claim of unjust enrichment are: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it. *Baptist v. JP Morgan Chase Bank, N.A.*, --- F.3d ----, 2011 WL 1772657 *3 n. 3 (11th Cir. 2011). Plaintiffs clearly

conferred a benefit on Defendant Seymour Construction when they provided it $500,000 for soft costs. Seymour Construction was aware of this transfer of money and accepted it. It was proven at trial that Seymour Construction only used $50,000 of this money to pay for soft costs, and therefore it would be inequitable to allow Seymour Construction to retain the remainder of the $500,000.

### Count 3: Quasi Contract

An action brought upon the theory of unjust enrichment is essentially the same as quasi-contract claim. 42 C.J.S. *Implied Contracts* § 9. "[A] claim for unjust enrichment is an equitable claim based on a legal fiction which implies a contract as a matter of law . . . ." *14th & Heinberg, LLC v. Terhaar and Cronley General Contractors, Inc.* 43 So.3d 877, 880 (Fla. 1st DCA 2010). Thus, a quasi-contract is the tool used by the Court to provide a remedy in an unjust enrichment claim. I have already ruled that Plaintiffs prevailed on their unjust enrichment claim; therefore this count is duplicative and moot.

### Count 4: Conversion

Conversion is an "act of dominion wrongfully asserted over another's property inconsistent with ownership therein." *Warshall v. Price*, 629 So.2d 903, 904 (Fla. 4th DCA 1993)(citations omitted). The tort may occur where a person wrongfully refused to relinquish property to which another had the right of possession. *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir.

2009)(citations omitted). The evidence at trial proved the Schindewolfs requested the return of their $500,000, but Seymour Construction refused to return it. I have already determined that the $450,000 not spent on soft costs belonged to the Schindewolfs and was not properly kept by Seymour Construction. Therefore, Seymour Construction improperly converted $450,000 belonging to Plaintiffs who are entitled to its return.

### Count 5: Piercing the Corporate Veil

Since Plaintiffs did not prevail on their fraud count (see *infra*), piercing the corporate veil to find liability against Scott Seymour individually is not appropriate.

### Count 6: Fraud

The elements of fraud are (1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representation; and (5) resulting damage or injury. *Pitts Sales, Inc. v. King World Productions, inc.*, 383 F.Supp. 2d 1354, 1362-63 (S.D. Fla. 2005). Plaintiffs argued at trial that Seymour's statements in emails that he had "signed up for $500,000 of soft costs" and that he had "started writing checks" were false statements of current facts that induced the Schindewolfs to give the $500,000 to Seymour Construction. I find that these statements, although likely

false, did not induce the Plaintiffs to give Seymour Construction $500,000. The transfer of the $500,000 occurred as agreed upon in the MOI, and it does not appear that Defendant's later statements made any difference in Plaintiffs transfer of the money to Seymour Construction pursuant to the MOI.

Plaintiffs also argued that Defendants never had any intention to develop The View project and it was fraudulent for Defendants to represent that they intended to do so. However, there was insufficient evidence to establish that Defendants *never* intended to go forward with the project. It appears from all accounts that during the summer of 2007, when this agreement was made, that Seymour Construction intended to eventually complete the project. It was only later that the company failed to perform on the contract. Therefore, I find in favor of Defendants on count six.

## **Punitive Damages**

Plaintiffs seek punitive damages in count four (conversion) and count six (fraud). In count four, Plaintiffs allege that "Defendants' conduct in converting the funds to their own use outside the MOI was wrongful, willful, and malicious, justifying a judgment against Defendants . . . ." However, there was no evidence presented at trial regarding exactly where the $450,000 in funds went. It is unclear whether the company simply went insolvent, the money is still available, or if there were more malicious motives and the money was intentionally converted to other

uses. Therefore, there is insufficient evidence to find Defendants conduct was willfully malicious and warrants the imposition of punitive damages on this count.

Because I found in favor of Defendants on count six, punitive damages are not warranted based on that count either.

## CONCLUSION

**IT IS ORDERED:**

1. The Clerk is directed to enter judgment in favor of Plaintiffs against Defendant Seymour Construction, Inc., in the amount of $450,000, plus interest from June 30, 2007, until the date of this judgment.

2. The Clerk is directed to enter judgment in favor of Scott Seymour, individually, against Plaintiffs.

3. The Clerk is directed to close the file.

**ORDERED** on June 20, 2011.

/s/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**